UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOEL B. ISRAEL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 15-cv-11914-ADB |
| | * | |
| VOYA INSTITUTIONAL PLAN SERVICES, LLC, | * | |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

# MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiff Joel Israel filed this suit seeking approximately $32,000 in unpaid wages and commissions that he alleges Defendant Voya Institutional Plan Services, LLC ("Voya") unlawfully withheld from him in violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148. The Court previously denied Voya's Motion to Dismiss and to Compel Arbitration on October 26, 2015. [ECF No. 26]. Now before the Court are motions for summary judgment filed on May 11, 2016 by Israel [ECF No. 48] and Voya [ECF No. 49]. Voya argues that because Israel resigned voluntarily, he is not entitled to compensation under the terms of the employment agreement. Israel claims he was involuntarily terminated and also argues that the compensation constituted "commissions" which were withheld in violation of the Massachusetts Wage Act. Voya responds that the compensation was a bonus and therefore not protected by the Wage Act. For the reasons set forth below, Israel's motion is granted, and Voya's motion is denied. In addition, Israel's pending motion to strike [ECF No. 60] is denied as moot.

## I. FACTUAL BACKGROUND[1]

### A. Relevant Events

Israel began working for ING Institutional Plan Services, LLC on November 11, 2013. Voya Institutional Plan Services, LLC is the successor-in-interest to ING Institutional Plan Services, LLC, and Voya and ING are treated as the same entity for the purposes of this proceeding. Israel was employed by ING (hereinafter referred to as Voya) as a "Sales Rep-Retirement Services." He was an employee at will. Israel was paid a fixed annual income of $50,000, plus a variable amount based on sales. His variable compensation was determined according to a policy set forth in a document entitled Advisor Production Compensation Plan Summary (the "Plan"), which is discussed in more detail below.

In order to be employed as a "Sales Rep-Retirement Services," Israel was required to register as a "registered representative" with the Financial Industry Regulatory Authority ("FINRA"). When Israel applied to be a "registered representative," Voya submitted a form known as the U-4 to FINRA. When Israel ceased to be employed by Voya, it was required to submit a form known as the U-5 to FINRA.

Israel applied to transfer to a similar position at a different Voya entity in July 2014. Upon consideration of Israel's application, Voya came to believe that, in his initial application for employment, Israel had not been truthful about his reason for leaving his previous employer. On September 26, 2014, Voya informed Israel that it would not allow him to transfer, and furthermore, that it planned to terminate his employment. At that time, Voya presented Israel

---

[1] The following facts are drawn from the parties' joint stipulation of uncontested facts, [ECF No. 48-3], supplemented by particular facts set forth in Israel's statement of facts [ECF No. 48-2] that Voya has admitted [ECF No. 56]. While the parties differ on how to characterize certain facts, and dispute the admissibility of an affidavit [ECF Nos. 61, 68, 69], the parties essentially agree on the underlying material facts.

with the option of submitting a letter of resignation, which would allow Voya to report on the U-5 that Israel's termination was "voluntary," rather than firing him, which would require the involuntary termination to be reported on the U-5. Israel elected to resign, and submitted a letter of resignation the same day. The letter read as follows: "Effective 9/26/2014 I am tendering my resignation. I am willing to continue to work until I am told my services are no longer needed. I expect to be paid for all my work, unused vacation, commissions earned, and expenses (travel) incurred within the legally allowable period."

### B.     The Plan

According to the terms of the Plan, the variable component of Israel's compensation consisted of three parts: the Individual Component, the Discretionary Component, and the Forfeiture Component.

The Individual Component was a percentage of revenue generated by an "eligible" employee. Israel was considered an "eligible" employee for most of his employment and received payments accordingly, except for the compensation in dispute. Israel generated revenue for Voya when individual participants in defined contribution benefit plans, such as 401(k) plans, consulted with Israel and then authorized Voya to make investment decisions on their behalf instead of self-directing their investments. In order for revenue to be included in the Individual Component, the authorization given to Voya had to remain in effect for at least three consecutive months.

During the course of his employment, Israel was never entitled to receive a payment from the Discretionary Component, and for purposes of this motion, the Discretionary Component is not relevant.

The Forfeiture Component was based on the compensation generated by Voya employees

who were no longer eligible to participate in the Plan. The amount that would have been paid to the employee was forfeited and distributed to remaining Plan participants on a per-capita basis. The Plan document explained that current Plan participants receive this compensation because "the participants and accounts associated with the forfeited production compensation represent a service commitment for the remaining eligible participants." Part of the variable compensation that Israel seeks comes from the forfeiture component.

Beyond the three categories of compensation, under the heading "Payments," the Plan document stated: "Payments under this program are paid in the payroll immediately following the third month after the month that production activity occurred (i.e. Payments in respect to enrollment activity in January, will be paid in the May 15th pay period). In order for a participant to qualify for a production bonus, the participant must achieve certain levels of performance, as described above, and fulfill his/her duties satisfactorily and in a manner that enhances the image and reputation of [Voya], each determined by [Voya] in its sole discretion."

The Plan provided that a "participant who accepts a non-eligible position within [Voya], involuntarily terminates, becomes permanently disabled, retires, or dies shall receive any bonus earned under this Program prior to such event, provided all requirements are met. In the event of death, payment will be issued in the name of the deceased and forwarded to his/her estate. Employee should be actively employed (not on a leave of absence or terminated) to receive payment. Employee who resigns (voluntary termination) will not be entitled to any pro-rated payment."

The Plan specified that Voya reserved the authority to "decide all questions and matters relating to the interpretation and administration of the Plan." It also stated that "no person shall have any claim or right to be granted a bonus award under this Plan," and that "decisions to pay

or not to pay an award, [and] the amount of the award to be paid . . . shall be made by the Board of Directors or its designee(s), in its sole and absolute discretion."

### C. Israel's Participation in the Plan

Israel was paid the variable component of his compensation, calculated according to the Plan, on a monthly basis beginning on or about February 15, 2014, through September 15, 2014. Following his resignation, Israel was not paid any of the variable compensation that was earned prior to his resignation but that would have normally been paid after his employment with Voya had ended, due to the 3-month lag time in the payment of the variable component.

The parties agree that, if Israel is entitled to variable compensation under the Plan for the months of June, July, August and September 2014, it would consist of the following amounts: $5,514.43 for revenue generated from lines of business in June 2014; $5,889.94 for revenue generated from lines of business in July 2014; $15,144.52 for revenue generated from lines of business in August 2014; and $5,200.10 for revenue generated from lines of business in September 2014.

## II.  DISCUSSION

### A. Standard of Review

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" Lockridge v. The Univ. of Me. Sys., 597 F.3d 464, 469 (1st Cir. 2010) (quoting Fed. R. Civ. P. 56). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "A 'material' fact is one

'that might affect the outcome of the suit under the governing law.'" Lockridge, 597 F.3d at 469 n.3 (quoting Anderson, 477 U.S. at 248).

### B. Voluntariness of Termination

Israel argues that he was involuntarily terminated, and thus, under the terms of the Plan, he is eligible to receive the variable compensation for the months in question. Voya responds that Israel tendered his resignation voluntarily, which makes him ineligible to receive the variable compensation. Voya cites cases in support of the existence of a general presumption that resignations are voluntary, but it appears that these cases concerned situations in which the employee had some sort of legal right to employment or due process, and thus was entitled to greater procedural protections than an at-will employee. See Pierce v. Alice Peck Day Mem'l Hosp., No. CIV. 00-318-M, 2002 WL 467125, at *5 n.2 (D.N.H. Mar. 11, 2002) (plaintiff alleging she was fired in violation of FMLA); Lewis v. Bos. Redevelopment Auth., No. CIV. A. 94-12103-GAO, 1996 WL 208473, at *4 (D. Mass. Apr. 4, 1996) (government employee alleging he was a "permanent employee" entitled to statutory protections); Christie v. United States, 518 F.2d 584, 587 (Ct. Cl. 1975) (plaintiff alleging wrongful termination from government employment). It is unclear whether these cases apply in the present context, where Israel was an at-will employee with no entitlement to continued employment or procedural due process.

Regardless of the applicability of these cases, however, Voya is correct that the resignation was a voluntary termination. Israel chose to resign, rather than to be fired, because he stood to gain certain benefits, including that the U-5 form would reflect a voluntary departure, and he could truthfully represent to future employers that he had left Voya voluntarily. Since he obtained these benefits by submitting a voluntary resignation, it would be inequitable and

6

inconsistent to rule now that his termination was involuntary for purposes of his compensation. Although it is possible that Israel may not have understood that he risked losing some compensation when he opted to resign, as his resignation letter suggests, the Court is nevertheless unable to conclude that Israel was involuntarily terminated. Thus, it appears that Voya did not violate the terms of the Plan by failing to pay the variable compensation to Israel.

### C. Massachusetts Wage Act

Israel next claims that Voya's refusal to pay him the variable compensation violates the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148. Israel argues that the variable compensation was a commission, not a bonus, under the framework of the act, and therefore it must be paid to Israel. Voya denies that the Wage Act applies in this case, arguing that the compensation is a bonus that falls outside the act's protections, or alternately, if it was a commission, it was not "due and payable" under the terms of the act.

The Wage Act requires employers to pay employees earned wages within a specified amount of time. Id. "The basic purpose of the act is 'to prevent the unreasonable detention of wages.'" Weems v. Citigroup Inc., 900 N.E.2d 89, 92 (Mass. 2009) (quoting Boston Police Patrolmen's Ass'n, Inc. v. City of Boston, 761 N.E.2d 479, 481 (Mass. 2002)). The terms of the Wage Act are applicable to commissions "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." Mass. Gen. Laws ch. 149, § 148. Bonuses, in contrast, are generally not covered by the act. Doucot v. IDS Scheer, Inc., 734 F. Supp. 2d 172, 193 (D. Mass. 2010).

The act prohibits employers from entering into a "special contract" with an employee to exempt the employee from the protections of the act. Mass. Gen. Laws ch. 149, § 148. A contract purporting to release rights and remedies conferred by the Wage Act is only enforceable if the

7

agreement is "stated in clear and unmistakable terms," and it "must specifically refer to the rights and claims under the Wage Act that the employee is waiving." Crocker v. Townsend Oil Co., 979 N.E.2d 1077, 1087 (Mass. 2012). The Supreme Judicial Court has "consistently held that the legislative purpose behind the Wage Act (and especially the 'special contract' language) is to provide strong statutory protection for employees and their right to wages." Id. at 1086.

The parties dispute whether compensation under the Plan constituted a commission or a bonus. The statute does not define commission or bonus, aside from the description of a covered commission as being "definitely determined" and "due and payable." Mass. Gen. Laws ch. 149, § 148. Nor have the cases established a precise definition. "The term 'commission' is commonly understood to refer to compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price." Suominen v. Goodman Indus. Equities Mgmt. Grp., LLC, 941 N.E.2d 694, 705 (Mass. App. Ct. 2011).

Courts have determined that a commission must be based on the sales or revenue generated by the individual employee, as distinguished from a payment based on a percentage of the business's overall profits, which is not a commission. For example, where a physician was employed by a company that agreed to pay her a base salary plus a percentage of the profits generated by her own practice, the profit-related payments were commissions protected by the Wage Act. Feygina v. Hallmark Health Sys., Inc., No. MICV2011-03449, 2013 WL 3776929, at *5 (Mass. Super. July 12, 2013). The court explained that "[w]here an employee is promised both a base salary and additional payments based 'on the amount of revenue [s]he generated' for her employer, those additional payments are 'commissions' subject to the Wage Act." Id. (quoting Okerman v. VA Software Corp., 871 N.E.2d 1117, 1119, 1122–25 (Mass. App. Ct. 2007)). The court in Feygina contrasted that case with Suominen, which concerned a

8

construction manager who was promised a share in the profits generated by the projects he worked on. Suominen, 941 N.E.2d at 696–99. The court in Suominen decided that, "[w]hatever the precise boundary of the term 'commission' as used in the Wage Act," any money that the construction manager was owed under the profit-sharing plan was not a commission covered by the Wage Act. Id. at 705. Later, Roma v. Raito, Inc., No. 1:13-CV-10297-LTS, 2015 WL 1523098 (D. Mass. Mar. 31, 2015) relied on Suominen in holding that a similar profit sharing plan did not constitute a commission for purposes of the Wage Act. In Roma, the plaintiff was hired to head the defendant's district office and was promised a share of that office's profits. Id. at *1. The court explained that, because the agreement "expressly called for a share of the profits [of the business]—not a percentage of a sales price from the sale of goods, services or real estate," the payments were not commissions. Id. at *7.

In this case, it appears that the majority of Israel's variable compensation, the Individual Component, was based on revenue only from the accounts where Israel personally persuaded the client to allow Voya to actively manage their funds. This indicates that the payments would constitute commissions, not bonuses, under the logic of Feygina, Suominen, and Roma. The Forfeiture Component is a closer call. It was based on accounts that had been served by an investment advisor who was no longer participating in the compensation plan, but Israel and others received a share of that revenue because those accounts "represent a service commitment for the remaining" employees. While this means it is less like a commission, because it is not tied to Israel's work on those accounts, it is also not as all-encompassing as a general profit-sharing agreement; rather, it is a payment related to a certain subset of accounts for which Israel was expected to do some amount of work, and presumably he did do work on those accounts during his final months of employment.

9

Voya also argues that the variable compensation is not a commission because it is based on an ongoing stream of revenue, rather than a one-time sale. The definition of "commission" used by the cases, "compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price," Suominen, 941 N.E.2d at 705, arguably contemplates this result. Voya's argument would mean, however, that individuals working in certain positions or industries, like Israel, would be ineligible to receive commissions protected by the Wage Act, since the transactions that generate revenue do not involve a singular "sale." It is not clear, however, why compensation based on a stream of revenue should be treated differently when the compensation is otherwise structured precisely like a commission: it rewards the work that Israel did to successfully persuade the customer to use Voya's services, as well as the work he did to assist that customer on an ongoing basis, and provides Israel a percentage of the profits from that sale. Further, the Court is mindful that the Massachusetts Appeals Court in Okerman cautioned against attempts to read limitations into the Wage Act that are not present in the actual text of the statute, 871 N.E.2d at 1122–23, and the Wage Act says nothing to indicate that certain industries or types of revenue should be excluded from the act's protections for commissions. Thus, the Court cannot conclude that the variable compensation is not a commission merely because it is based on an ongoing stream of revenue rather than a one-time sale.

Next, Voya contends that the variable compensation was a bonus (or, alternatively, a commission falling outside the protections of the Wage Act) because the compensation was subject to contingencies which meant it was not "due and payable" to Israel at the time of his departure. The Plan required the participant to be "actively employed (not . . . terminated) to receive payment," and Israel was not employed at the time he would have received the variable

compensation in question. In addition, per the terms of the plan, Voya retained broad discretion: "The decisions to pay or not to pay an award, the amount of the award to be paid and to whom an award will be paid, shall be made by the Board of Directors or its designee(s), in its sole and absolute discretion."

Voya likens these terms in the Plan to cases holding that retention bonuses are outside the terms of the Wage Act, but that comparison misses the mark. In Weiss v. DHL Express, Inc., 718 F.3d 39, 42 (1st Cir. 2013), the employee received a bonus, paid in two annual installments, which was conditioned solely on his remaining an employee of the company "in good standing." The terms of the agreement allowed the employer to deny the bonus if, in its judgment, the employee was terminated for good cause. Id. at 46. The court held that because the employer reasonably decided that the employee did not satisfy these contingencies, it was under no obligation to pay the bonus. Id. at 47–48. In Weems v. Citigroup Inc., 900 N.E.2d 89, 91 (Mass. 2009), employees received some of their "annual discretionary incentive bonus" in the form of stock that vested in three years. The court determined that the Wage Act did not apply to this part of the employees' compensation because the awards were discretionary and contingent on the employee remaining with the company for the time it took the stock to vest. Id. at 94. Lastly, in Sheedy v. Lehman Bros. Holdings Inc., No. CIV.A. 11-11456-RGS, 2011 WL 5519909, at *1 (D. Mass. Nov. 14, 2011), the employee received a "one-time incentive signing bonus" of $1,000,000 that her employment agreement characterized as a "forgivable loan." The balance was to be reduced by $200,000 on each anniversary of her employment for five years. Id. The court held that the portion of the loan that had not been forgiven at the time of the employee's termination "was never 'earned' within the meaning of the Wage Act," so she was required to return it to the employer. Id. at *2, *4.

Weiss, Weems, and Sheedy were cases in which the payments in question, occasional bonuses designed to incentivize the employees to stay with the employer, normally would fall outside the terms of the Wage Act. In each of those cases, the employee attempted to argue that the bonuses were protected by the act because they had already become "definitely determined" and "due and payable." The courts rejected those arguments, finding that the payments were discretionary or subject to certain contingencies that had not been met. Thus, these cases provide only limited guidance in assessing the present case. The variable compensation earned by Israel is much closer to a commission than any of the bonus agreements discussed in Weiss, Weems, and Sheedy, since it was part of Israel's monthly pay and was calculated as a share of the revenue he generated, rather than being a once-yearly bonus based entirely on remaining employed. Further, holding that *any* payment conditioned on a contingency automatically falls outside the protections of the Wage Act would open up a loophole in the act and directly contravene the prohibition on special contracts. The better reading of these cases is that a true bonus normally falls outside the bounds of the act, with the possible exception of a situation where the bonus has been promised, the employee has fulfilled her end of the bargain, and yet the employer attempts to renege. See Sheedy, 2011 WL 5519909, at *4 ("The law is clear that incentive or other bonus compensation is outside the scope of the Wage Act unless it qualifies as 'commissions' that are ascertained and due.").

The parties have also discussed McAleer v. Prudential Ins. Co. of Am., 928 F. Supp. 2d 280 (D. Mass. 2013), which is in many ways the most factually similar to the present case. In McAleer, the employee received a base salary plus commissions under a Prudential compensation plan that resembled Voya's compensation plan (though it was based on discrete sales rather than revenue streams). Id. at 282–83; Am. Compl., Ex. 2, McAleer (No. 1:12-cv-

10839-DPW), ECF No. 26-2. Like Voya's plan, the Prudential plan provided that commissions would be paid on a delayed basis, and would only be paid to individuals who were employed in good standing at the time of payment; no payment would be made to those who resigned or were terminated for cause. Id. The employee, whom Prudential claimed was terminated for cause, sued under the Wage Act to recover commissions from sales generated during the last months that he worked. McAleer, 928 F. Supp. 2d at 282–84. Prudential argued that the commissions were not "definitely determined" because Prudential retained the discretion not to award them. Id. at 288. The court disagreed. Id. The court read the terms of Prudential plan as giving Prudential discretion in the *administration* of the plan, but not the decision whether to award the commissions at all, explaining that interpreting "the discretion under the plan as broadly as Prudential would have it would render the plan meaningless." Id. The court also rejected Prudential's argument that the commissions were not "due and payable" to the employee. Id. at 288–90. Ultimately, the court held, *inter alia*, that Prudential had no justification for withholding commissions earned prior to the end of employment. Id. at 290. McAleer establishes that commissions contemplated by an employment contract that reserves some discretion for the employer are not removed from the ambit of the Wage Act due solely to the discretionary aspect of the contract.[2]

Dictionary definitions of "commission" and "bonus" provide some additional insight, and further indicate that Israel's variable compensation was a commission, not a bonus. Black's Law

---

[2] The employee in McAleer alleged that he had been fired due to age discrimination. The court explained that, "[i]f, indeed, his termination was the result of unlawful discrimination and not poor performance, Prudential may not avoid liability under the Wage Act merely by asserting retention of discretion not to award commissions." Id. at 288. This suggests that the court may have believed that a termination for cause could be justification for the employer to retain commissions. However, the court did not reach that question, and nothing in the Wage Act states that a commission may be withheld if the employer had good cause to terminate the employment.

Dictionary defines "Bonus" as "[a] premium paid in addition to what is due or expected; esp., a payment by way of division of a business's profits, given over and above normal compensation <year-end bonus>." Bonus, *Black's Law Dictionary* (10th ed. 2014). The definition goes on to explain that "[i]n the employment context, workers' bonuses are not a gift or gratuity; they are paid for services or on consideration in addition to or *in excess* of the compensation that would *ordinarily* be given." Id. (emphasis added). Evident in this definition is the occasional, infrequent, and exceptional nature of a bonus. Rather than forming a part of the employee's ordinary compensation, a bonus is something unusual, above and beyond the normal paycheck. In contrast, Israel's variable compensation was paid monthly and constituted a significant portion of his monthly pay. The word "commission" comes much closer to describing the variable compensation that Israel received. The Oxford English Dictionary defines "commission" as "[p]ayment, or a payment, for services or work done as an agent in a commercial transaction, typically a set percentage of the value involved." Commission, n.7b, *OED Online* (2016), http://www.oed.com/view/Entry/37135 (last visited Mar. 8, 2017).[3] Israel's work involved generating revenue that Voya would receive over time, not all at once. The dictionary definition of "commission" appears to allow for the possibility that a percentage of a stream of revenue could qualify as a commission.

Lastly, it is worth noting that the authors of the relevant section of the Massachusetts Practice Series anticipated this type of Wage Act case and recognized it as one that would be particularly difficult to resolve:

---

[3] Similarly, the Merriam-Webster dictionary defines "commission" as "a fee paid to an agent or employee for transacting a piece of business or performing a service," in particular, "a percentage of the money received from a total paid to the agent responsible for the business." Commission, *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/commission (last visited Mar. 8, 2017).

> [S]ometimes employers impose contingencies unrelated to the completion of the sale, which present more difficult questions. Suppose, for example, an employer computes commissions on a quarterly basis and imposes a requirement that the employee be employed as of the close of the calculation period in order to receive payment. It is doubtful that such a provision could be invoked to deny commission payments to an employee on sales completed during the computation cycle merely because the employee's employment terminated prior to the completion of the cycle, particularly if the termination were involuntary and without good cause. Otherwise, the basic purpose of the statute—to assure payment of income on a timely basis and payment in full to employees on termination—could be avoided by simply imposing as an arbitrary condition retention in employment on the date of payment.

Payment of wages on a timely basis—Commissions, 45 Mass. Prac., Employment Law § 16:3 (3d ed.).

Considering all of the above, the Court concludes that the variable compensation in dispute constituted commissions that were "definitely determined" and "due and payable" once Israel left Voya's employment. The payment scheme is undeniably more like a commission than a bonus. There is also no real question that the amount was "definitely determined,"[4] since the parties agree on the precise amount that would have been paid to Israel for the months in question had he remained employed by Voya. The case comes down to whether the amount in question was "due and payable" to Israel once he resigned.

Given the purpose of the Wage Act to provide robust protection for employees against the unreasonable detention of wages, and considering the warning in Okerman against judicial attempts to narrow the law, 871 N.E.2d at 1122–23, the Court determines that Voya's decision to withhold the commissions that Israel earned during his final months of employment violated the Wage Act. Israel did the work to earn the commissions prior to his resignation, and the fact that it may have taken Voya a few months to make a final calculation as to the exact amount of the

---

[4] "Definitely determined" has been interpreted to mean "arithmetically determinable." Wiedmann v. The Bradford Grp., Inc., 831 N.E.2d 304, 312 (Mass. 2005), superseded by statute on other grounds.

commissions is not sufficient to take them outside the scope of the Wage Act. See Feygina, 2013 WL 3776929, at *2, *5 (commissions earned prior to termination of employment were protected by Wage Act even though they were not calculable until several months later). Further, to decide otherwise would be to permit, even encourage, employers to evade the law by imposing lengthy delays on the payment of commissions and conditioning the payments on continued employment. Indeed, in this case, the amount that Israel stands to lose is determined entirely by the length of time that Voya delayed payment; if Voya had imposed a six-month lag on commission payments, for example, then Israel would have potentially lost six months' worth of commissions. It does not appear that the Wage Act permits an employer to withhold commissions in such a manner, and the Court will not sanction that approach. Therefore, Voya must pay Israel the commissions that he earned prior to his resignation.

## III.     CONCLUSION

Accordingly, Israel's motion for summary judgment [ECF No. 48] is GRANTED, and Voya's motion for summary judgment [ECF No. 49] is DENIED. Israel's motion to strike [ECF No. 60] is DENIED as moot. Israel may file a motion for attorneys' fees by April 7, 2017.

**SO ORDERED.**

March 16, 2017                                                                      /s/ Allison D. Burroughs
                                                                                              ALLISON D. BURROUGHS
                                                                                              U.S. DISTRICT JUDGE

16